Filed 5/25/21  P. v. Wilson CA1/4

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIRST APPELLATE DISTRICT

## DIVISION FOUR

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>ANTHONY WILSON,<br><br>    Defendant and Appellant. | A157926,<br><br>(Alameda County<br>Super. Ct. No. 619131A) |
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>AODERI SAMAD,<br><br>    Defendant and Appellant. | A157930<br><br>(Alameda County<br>Super. Ct. No. 619131B) |
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>TYRONE TERRELL,<br><br>    Defendant and Appellant. | A157931<br><br>(Alameda County<br>Super. Ct. No. 619131E)<br><br>**ORDER MODIFYING OPINION; AND ORDER DENYING PETITION FOR REHEARING [NO CHANGE IN JUDGMENT]** |

1

**THE COURT\*:**

It is ordered that the opinion filed herein on May 6, 2021, be modified in the following particulars:

On page 42, line 10, the following sentence is deleted:

Third, this claim fails on its merits.

The deleted text is replaced with the following sentence:

Third, because this claim fails on its merits, we reject the contention made for the first time in Wilson's reply brief, that an exception to the forfeiture rule applies. (See § 1259.)

This modification does not effect a change in the judgment.

Appellants' petitions for rehearing are denied.


Dated:_____ _____Acting P.J.

*People v. Wilson/Samad/Terrell* (A157926/A157930/A157931)

---

\* Streeter, Acting P.J., Tucher, J. and Brown, J. participated in the decision.

2

Filed 5/6/21  P. v. Wilson CA1/4 (unmodified opinion)

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>ANTHONY WILSON,<br><br>        Defendant and Appellant. | A157926,<br><br>(Alameda County<br>Super. Ct. No. 619131A) |
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>AODERI SAMAD,<br><br>        Defendant and Appellant. | A157930<br><br>(Alameda County<br>Super. Ct. No. 619131B) |
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>TYRONE TERRELL,<br><br>        Defendant and Appellant. | A157931<br><br>(Alameda County<br>Super. Ct. No. 619131E) |

Anthony Stevens was shot and killed while attempting to flee from a group of six men.  A jury found three of the men guilty of murder; Anthony Wilson and Tyrone Terrell were convicted of second degree murder, and Aoderi Samad was convicted of first degree murder.  (Pen. Code, § 187;

statutory references are to this code.)  In separate appeals, which we consider together, Wilson, Terrell and Samad allege multiple trial errors.  Terrell and Samad also allege sentencing errors.  We affirm the judgments.

## BACKGROUND

### I.  The Prosecution Case

Stevens was murdered on 92nd Avenue in Oakland, near the intersection of International Boulevard.  Surveillance cameras captured the incident from different angles, and the participants were all identified during a subsequent police investigation.

#### A.  The Murder

On the morning of July 9, 2016, Stevens made plans to get a haircut from his cousin, who operated a barbershop on the corner of 92nd Avenue and International Boulevard in East Oakland.  At 10:08 a.m., Stevens parked a white Toyota on 92nd Avenue, facing south toward International.  He walked to a store then returned to his car and sat in the front passenger seat.  Meanwhile, people gathered nearby to participate in a vigil for Roderick Tucker, who had been murdered the previous night.  Tucker, who was known as T.J., had been sitting in a car on International Boulevard when he was shot by unknown assailants.  Kayla Walker attended T.J.'s vigil.  On the morning of July 9, she parked her car on 92nd Avenue behind Stevens and noticed him reclining in the passenger seat of his car when she walked by.

At 10:18 a.m., a white Honda and silver Nissan traveling south on 92nd drove past Stevens and stopped at the corner of International.  Terrell and Samad got out of the Honda, and Derick McFadden got out of the Nissan.  The drivers then turned around and parked both cars on the opposite side of the street from Stevens.  Wilson got out of the Honda, and Kermit Tanner got out of the Nissan, accompanied by Wilson's younger brother Xavier.  The

2

three men walked diagonally across the street, and as they passed the driver's side of Stevens's car, Tanner and Wilson appeared to look inside. On the sidewalk, Wilson stopped to tie his shoe and looked back at Stevens's car before the three men turned the corner onto International.

At 10:30 a.m., all six men walked back around the corner onto 92nd Avenue. Kayla Walker, who had gone to get something from her car, walked past the men as she was returning to the vigil, but she did not interact with them. After Walker turned the corner, Samad, McFadden and Tanner turned and walked toward the corner. Wilson and Terrell walked toward the white car where Stevens sat. They approached opposite sides of the car, and Xavier trailed behind Wilson.

Wilson looked in the back driver's side window of the car, while Terrell went to the front passenger side where Stevens was sitting and opened the door. Almost immediately, Stevens stood up out of the car, raising his opened left hand. Stevens had a gun in his right hand and held his right arm down at his side as he faced Terrell, his back against the opened door. Then, as Terrell moved his right hand to his waist, Wilson fired a gun, hitting the window directly behind Stevens, whose face registered alarm. Stevens pivoted around the door and ran toward International while Wilson and Terrell fired multiple shots at him.

The other three men had not yet reached the corner when shots were fired, and they all turned to look. Then Tanner ran around the corner. Samad and McFadden fired guns at Stevens and then also retreated onto International. Stevens fell to the ground, dropped his gun without ever firing it, and began crawling toward the street, appearing to seek refuge behind a parked car. As Stevens struggled to get away, Samad returned to 92nd Avenue, fired at Stevens's back, then ran around the corner. On

3

International Boulevard, McFadden went down on the ground, holding his leg as if he had been shot. Samad retrieved a gun that McFadden had dropped. Then the three men hurried back to the Nissan on 92nd Avenue. On his way to the car, Samad picked up the gun Stevens had dropped.

Kayla Walker, who heard the gunfire, took a different route to her car when she felt safe to do so. She found Stevens, still alive but struggling to breathe, and went for help. Emergency aid was rendered but Stevens died at the scene. The doctor who performed Stevens's autopsy determined that he died from multiple gunshot wounds. The "worst" wound was inflicted by a bullet that entered the right side of Stevens's back and passed through his liver and heart before exiting the left side of his chest.

## B. The Investigation

Oakland Police Sergeant Michael Cardoza was assigned to investigate Stevens's murder. Cardoza was aware of surveillance cameras in the area because he had assisted in the investigation of the murder of T.J. the previous night. He obtained surveillance film, which recorded activity on 92nd Avenue and on International Boulevard during the period that Stevens was killed.

On the day Stevens was murdered, Cardoza was notified about a "walk-in gunshot victim" at Highland Hospital. The victim was Derrick McFadden, who told the investigating officer that he was shot in North Oakland by an unknown assailant in a black car with tinted windows. McFadden reported that "[s]ome dude" had found him on the ground screaming and gave him a ride to the hospital in exchange for $40. Oakland police had no information verifying McFadden's report of where and when he was shot. Cardoza suspected McFadden was involved in Stevens's murder. As McFadden was from Berkeley, Cardoza requested assistance from a police officer who had

4

been a school resource officer and coach at Berkeley High School. The officer identified four of the six men who appeared in surveillance video of the Stevens murder: Samad, Terrell, McFadden, and Tanner.

On the early morning of July 21, 2016, police executed warrants at an apartment in Vallejo, where they found twelve people, including Wilson, Samad and Tanner. In the living room of the unit, there was a memorial to T.J., who was Wilson's half-brother. Two loaded pistols were found in a toilet tank and another was found under the furnace. In a bedroom, police found Wilson's identification, ammunition, gun magazines, and two loaded pistols.

On July 21, 2016, police also executed warrants at two residences in Sacramento that had been connected to Terrell, but he was not found at either location. On September 20, 2016, police located Terrell at a residence in Elk Grove, where he was taken into custody after he fell through a ceiling in the house.

## C. Statements by the Defendants

On July 21, 2016, Sargent Cardoza interviewed Wilson for a few hours, showing him still photographs from the surveillance video of the Stevens shooting. Near the end of the interview, Wilson identified himself in some of the photos, admitted that his girlfriend Rayquel L. owned the white Honda, and apologized for wasting Cardoza's time. After the interview, Wilson called Rayquel and Wilson's father got on the phone. Wilson told his father that he had not been involved in the Stevens shooting and did not know anything about it, but was afraid he was in trouble because "[t]hey came with pictures." During a subsequent call, Wilson told Rayquel that he knew he had not done anything, but explained to her that "what they showed me made it seem like I did."

5

On July 21, 2016, Cardoza also interviewed Samad. Samad admitted knowing T.J., but denied attending his vigil. Cardoza showed Samad still photos and also played part of the video. Samad denied that he was the person in the pictures and claimed not to recognize the people who shot Stevens. After the interview, Samad called the mother of his child and instructed her to register his car in her name. Samad said he "wanted to fold," but he would "never break for nobody."

In September 2016, Terrell made several phone calls after his arrest. Terrell complained to his girlfriend and to his mother that someone told the police where he was hiding. To his mother, Terrell also denied involvement in the shooting but told her, "[t]hey tried to show me a picture and say it was me."

## II. Criminal Proceedings

In December 2017, the Alameda County District Attorney charged Wilson, Terrell, Samad, McFadden and Tanner with the murder of Anthony Stevens. Multiple enhancement allegations were alleged, including that Wilson, Terrell, Samad and McFadden personally discharged a firearm causing great bodily injury and death. Wilson, Terrell and Samad were also charged with a second count of being a felon in possession of a firearm.

In November 2018, trial proceedings began. On November 15, the case against Tanner was set for a possible disposition. The record does not disclose how the matter was resolved, but Tanner did not participate further in the trial proceedings. In December 2018, the court denied Terrell's severance motion, and a jury was selected. On January 8, 2019, the People began presenting evidence, resting their case on January 23. Thereafter, Wilson testified on his own behalf and Terrell testified on his own behalf. Samad and McFadden did not call witnesses.

## III. The Defense Cases

### A. Wilson

Wilson testified that he was very close to his half-brother T.J., who was a few years younger than him. On the night T.J. was shot, Wilson went to the crime scene to find out what happened but the police would not give him any information. Then he went to the hospital to be with T.J. After T.J. died, Wilson stayed up all night with family and friends. The next morning, he tried to find out what happened to his brother. He took Rayquel L.'s car, grabbed a gun for protection and returned to the scene where T.J. had been killed. Several friends came along for support.

Wilson parked on 92nd Avenue because International Boulevard is a busy street and he did not want to get pulled over when he was carrying a gun. Wilson noticed Stevens in a white car but at that point he was focused on getting to the location where T.J. had been killed. He did not know about the vigil until he got to International Boulevard. People shared some information with Wilson, but nobody identified the perpetrators. Wilson became very sad and told Samad it was time to go. As they walked back down 92nd Avenue, Wilson saw Stevens again and decided to ask him about T.J.'s murder. Terrell had the same idea and said, "let's ask him."

Wilson saw Stevens in the front passenger seat, but the rear window on the driver's side was down, so Wilson went there to speak with Stevens. He asked, "Do you know what happened to my brother?" and Stevens replied, "No." Then Wilson saw the right front passenger door "pop" open. As Stevens began to step out of the car, Wilson saw that Stevens was holding a gun in his hand that had a "long clip hanging out of it."

Wilson testified that Stevens raised his gun as he got out of the car. To explain what Stevens did, Wilson demonstrated with his body and the trial

court described the action for the record. According to Wilson, when Stevens started to get out of the car, his right arm was bent to his waist and the gun was in his right hand. Then he raised his right arm straight out at shoulder level.

Wilson testified that when he realized Stevens had a gun, he said the word "Gun," but he did not think Terrell heard him because everything happened so fast. When Stevens raised the gun, Wilson thought Stevens was about to kill Terrell, so he "reacted" by pulling out his gun and shooting first. Wilson was afraid for his own life and for the safety of his friends because Stevens had enough rounds to kill them all. At trial, Wilson could not recall how many shots he fired, but testified that he just kept shooting out of fear.

Wilson fled the scene with Terrell and Xavier, his only thought that they were in danger. He went to his home in Oakland, packed some belongings, including his PlayStation, and went to his father's home in Vallejo. He did not tell his parents what had happened because he was afraid information would "get out" and be misrepresented. He sold the gun he used to shoot Stevens because he was afraid of being charged with murder. When police executed the warrant at the Vallejo apartment, Wilson knew they were there to arrest him for the Stevens murder, so he hid two guns in the toilet.

After he was arrested, Wilson denied involvement in the incident because he was scared and he did not think Sargent Cardoza would believe his version of the events. Wilson testified that there was no doubt in his mind that he needed to use deadly force to defend himself from Stevens, but before he met with his lawyer, he did not realize that he had a self-defense claim.

8

## B. Terrell

Terrell testified that he grew up with Wilson in Berkeley, and T.J. was like a little brother to him. In 2014 or 2015, Terrell moved to Sacramento with his mother. When Terrell heard about T.J.'s shooting, he armed himself and drove to the hospital in Oakland. Terrell brought his gun, which was always loaded, because Oakland is a dangerous place. After T.J. died, Terrell went to Wilson's house, where people were "reminiscing" and the atmosphere was very sad. Terrell drank, smoked marijuana, and slept for only an hour.

The next morning, Terrell accompanied a group of men to T.J.'s vigil. Terrell knew that additional shootings often happen at street-side vigils, but he decided to go because he wanted information. After about 30 minutes, somebody said they were ready to leave, so the group headed back to the cars. Terrell was aware that he was walking next to Wilson but was not paying attention to the other guys. As they walked down 92nd Avenue, Terrell noticed Stevens sitting up in the passenger seat of a Toyota. He assumed Stevens was "there for TJ," and told Wilson that he was going to ask if Stevens knew anything about T.J.'s death.

Terrell testified that he made eye contact with Stevens before he approached the passenger door and opened it with his right hand. His behavior was not threatening and he denied trying to intimidate Stevens, but he admitted that opening the door was "dumb" and a "big mistake." Terrell recalled using a normal voice to ask if Stevens had been in the area the previous day, stepping back as he asked the question. Stevens appeared "angry" and "mad" as he responded, "What the fuck you open my door for?" At that point, Terrell noticed Stevens had a gun and "got scared." Terrell moved his hands to his waist, where he had his gun, and stepped back as he said "[m]y bad for opening your door. I'm only here for TJ." Then Stevens got

9

out of the car and moved toward Terrell, raising his gun. Stevens's arm was coming up to "mid-chest level" when Terrell heard a gunshot. Terrell thought that Stevens had fired the gun and that he was about to die, so he pulled out his gun and started shooting.

Terrell testified that he did not try to kill Stevens. He kept shooting as Stevens ran away from him because Stevens had a gun and was still very close. He was just protecting himself and trying to put distance between them so that he could safely escape.

After the shooting, Terrell went to Wilson's home and then to the apartment in Vallejo. Before he returned to Sacramento, Terrell threw his cellphone out the car window and sold his gun to someone in Richmond. Terrell admitted that he tried to hide in an attic when police came to arrest him in Sacramento. He also admitted lying about his involvement in the shooting before he learned about fingerprint evidence connecting him to the crime. A latent print examiner matched a couple of fingerprints lifted from the inside of Stevens's passenger-side door handle to Terrell's right hand.

## IV. Jury Verdicts and Sentence

The case was submitted to the jury on the morning of February 4, 2019. During deliberations, the jury reviewed surveillance videos and other physical evidence, returning verdicts on February 6 at 4:00 p.m.

Wilson and Terrell were each found guilty of second degree murder (§ 187, subd. (a)), and of being a felon in possession of a firearm (§ 29800, subd. (a)(1)). For each of them, the jury found true the full range of firearms allegations: that each personally and intentionally discharged a firearm causing great bodily injury and death (§§ 12022.7, subd. (a) & 12022.53, subd. (d)), discharged a firearm within the meaning of section 12022.53,

subdivision (c), and used a firearm within the meaning of sections 12022.5, subdivision (a) and 12022.53, subdivision (b).

The jury found Samad guilty of first degree murder (§ 187, subd. (a)) and of being a felon in possession of a firearm (§ 29800, subd. (a)(1)), and found true all the same firearms allegations—that Samad personally and intentionally discharged a firearm causing great bodily injury and death (§§ 12022.7, subd. (a) & 12022.53, subd. (d)), discharged a firearm within the meaning of section 12022.53, subdivision (c), and used a firearm within the meaning of sections 12022.5, subdivision (a) and 12022.53, subdivision (b).

McFadden was found guilty of voluntary manslaughter (§ 192, subd. (a)), and of personally using a firearm (§ 12022.5, subd. (a)). Because McFadden has not filed an appeal with this court, we address his involvement only as it is pertinent to his codefendants' appeals.

Defendants were sentenced on July 19, 2019. Considering Wilson, Terrell, and Samad separately, the court concluded for each of them that the defendant was not eligible for probation, and that there were multiple aggravating sentencing factors and no mitigating factors. Wilson and Terrell each received an aggregate sentence of 40 years to life, comprising the following terms: 15 years to life for second degree murder; a consecutive term of 25 years to life for personally and intentionally discharging a firearm causing death; a concurrent term of eight months for being a felon in possession of a firearm; and stayed terms of 20 years, 10 years and 10 years for the other firearm enhancements. Samad's sentence was 50 years to life, which included: 25 years to life for first degree murder; a consecutive term of 25 years to life for personally and intentionally discharging a firearm causing death; a concurrent term of eight months for being a felon in possession of a

11

firearm; and stayed terms of 20 years, 10 years and 10 years for the other firearm enhancements.

## DISCUSSION

### I. Sufficiency of the Evidence Claims

Samad and Terrell contend their convictions must be reduced to voluntary manslaughter because there is insufficient evidence that they killed Stevens with malice aforethought.  Samad contends further that his conviction for first degree murder must, at the very least, be reduced to second degree murder because there is insufficient evidence that he acted with premeditation and deliberation.

We review these claims under the substantial evidence standard, which requires us to consider the entire record in the light most favorable to the judgment.  (*People v. Clark* (2011) 52 Cal.4th 856, 942.)  " 'Substantial evidence includes circumstantial evidence and any reasonable inferences drawn from that evidence.' " (*Id*. at p. 943.)  "We ' " 'presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence.' " ' " (*Ibid*.)

#### A.  Legal Principles

Murder is "the unlawful killing of a human being . . . with malice aforethought."  (§ 187.)  " 'Express malice is an intent to kill. . . .  Malice is implied when a person willfully does an act, the natural and probable consequences of which are dangerous to human life, and the person knowingly acts with conscious disregard for the danger to life that the act poses.' " (*People v. Beltran* (2013) 56 Cal.4th 935, 941–942 (*Beltran*).)

"A killing with express malice formed willfully, deliberately, and with premeditation constitutes first degree murder.  [Citation.]  'Second degree murder is the unlawful killing of a human being with malice aforethought

12

but without the additional elements, such as willfulness, premeditation, and deliberation, that would support a conviction of first degree murder.' " (*Beltran*, *supra*, 56 Cal.4th at p. 942.)

"Manslaughter, a lesser included offense of murder, is an unlawful killing without malice. [Citations.] Section 192 establishes three kinds of manslaughter: voluntary, involuntary, and vehicular." (*People v. Elmore* (2014) 59 Cal.4th 121, 133.) Voluntary manslaughter, the crime at issue here, is deemed "less blameworthy than murder because of the attendant circumstances and their impact on the defendant's mental state. Two factors may preclude the formation of malice and reduce murder to voluntary manslaughter: heat of passion and unreasonable self-defense." (*Ibid.*) Because these mitigating circumstances negate the intent element of a murder charge, when issues of provocation or imperfect self-defense are presented by the evidence, the prosecution has the burden of proving these circumstances were lacking in order to establish the murder element of malice. (*People v. Rios* (2000) 23 Cal.4th 450, 460–461.)

**B. Terrell's Conviction is Supported By Substantial Evidence**

Terrell contends his murder conviction cannot stand because there is insufficient evidence he acted with express malice. According to this argument, the jury's finding that Terrell formed the "explicit intent to kill" must have been based on improper speculation because it is inconsistent with the video evidence, which shows that when Terrell "fired off a few rounds," he was at "all times" moving "away" from Stevens. (Italics omitted.)

Express malice—the intent to kill—can be inferred from factual circumstances surrounding a killing, including the defendant's action. (*People v. Smith* (2005) 37 Cal.4th 733, 741–742.) Here, there is evidence that after Terrell's friend fired a gun at Stevens, Terrell pulled out his gun

13

and shot at Stevens multiple times. That Terrell stepped back as he fired does not change the fact that Terrell fired his gun at the back of a fleeing victim. "[T]he very act of firing a weapon ' "in a manner that could have inflicted a mortal wound had the bullet been on target" ' is sufficient to support an inference of intent to kill." (*Id.* at p. 742.) Thus, the evidence supports an inference that Terrell had the intent to kill.

Further, Terrell overlooks that malice can be implied from a willful act, "the natural and probable consequences of which are dangerous to human life," when the person "knowingly acts with conscious disregard for the danger to life that the act poses." (*People v. Gonzalez* (2012) 54 Cal.4th 643, 653.) The finding that Terrell acted with implied malice is supported by substantial evidence that he and his friends accosted Stevens and then fired guns at him from multiple directions as he attempted to run away.

Terrell contends that even if the evidence might otherwise support a finding of malice, the prosecution failed to rebut evidence that Terrell acted in unreasonable self-defense. "Imperfect self-defense is the actual, but unreasonable, belief in the need to resort to self-defense to protect oneself from imminent peril. [Citations.] When imperfect self-defense applies, it reduces a homicide from murder to voluntary manslaughter because the killing lacks malice aforethought." (*People v. Vasquez* (2006) 136 Cal.App.4th 1176, 1178.) "A person who actually believes in the need for self-defense necessarily believes he is acting lawfully." (*In re Christian S.* (1994) 7 Cal.4th 768, 778.)

The video evidence shows that Terrell opened the door of a car that did not belong to him, stepped back far enough for the passenger to alight, and then fired his gun at the man's back as the man attempted to run away. The jury could have concluded from the video that Stevens never raised, pointed,

14

or fired his gun, but only ran from his assailants. This evidence substantially supports a finding that Terrell killed with malice rather than because of a mistaken belief that he needed to defend himself against Stevens.

Terrell contends his trial testimony corroborates video evidence showing that he was frightened by unexpected gunfire and actually believed he was in danger even if that belief was inaccurate. Terrell testified that he thought the gunshot that shattered the car window was fired by Stevens rather than Wilson. However, the jury could have found Terrell's testimony was not credible and concluded reasonably that Terrell was never afraid for his own life. Or the jury could have found that any fear Terrell experienced when he heard the initial gunshot dissipated quickly when he realized that Stevens was the target rather than the shooter. Even if the jury believed that Terrell initially perceived Stevens as a threat, there is substantial evidence that Terrell continued to fire bullets at Stevens after he realized that his own life was not in peril.

By separate argument, Terrell contends the jury was required to find that he acted in the heat of passion when he shot Stevens. "A heat of passion theory of manslaughter has both an objective and a subjective component." (*People v. Moye* (2009) 47 Cal.4th 537, 549.) The objective component requires proof that the killing was a reaction to provocation " 'that would cause an emotion so intense that an ordinary person would simply react, without reflection.' " (*People v. Rangel* (2016) 62 Cal.4th 1192, 1225 (*Rangel*), italics omitted.) The subjective element requires proof that the defendant killed "while under 'the actual influence of a strong passion' induced by such provocation." (*Moye,* at p. 550.)

Terrell characterizes the gunshot that Wilson fired at Stevens as an unexpected provocative act that inflamed Terrell's reason and impaired his

judgment, causing him to react by discharging his own weapon. But the video shows that Terrell did not react rashly, by firing indiscriminately. Terrell aimed his weapon and shot repeatedly at a man who was trying to run away from the same gunshot that allegedly caught Terrell unaware. Terrell simply ignores that Stevens never fired his gun at anyone and that Terrell shot at Stevens multiple times while Stevens was attempting to run away. These facts support a finding that no " 'ordinarily reasonable person of average disposition' " would have reacted to Wilson's gunshot as Terrell did in this case. (See *People v. Barton* (1995) 12 Cal.4th 186, 201.)

## C. Samad's Conviction Is Supported by Substantial Evidence

Samad argues his conviction must be reduced to voluntary manslaughter because there is evidence that he acted in unreasonable self-defense and the prosecution failed to carry its burden of disproving this mitigating circumstance. According to this argument, the video shows that Samad heard gun shots, turned to find a man running toward him with a gun, and reacted to the dangerous situation by firing his weapon. This account of the incident omits many pertinent facts: All gunshots were fired by Samad and his friends; the man who ran toward Samad was attempting to get away from the gunshots; and, crucially, after the man was shot, dropped his weapon and was crawling away, Samad came around the corner and shot him in the back. These facts, established by substantial evidence, support the jury's finding that Samad did not act in unreasonable self-defense.

Samad contends that his reaction to Stevens was identical to the reaction of McFadden, who was convicted of voluntary manslaughter, and that he is less culpable than Wilson and Terrell because he did not initiate the altercation with Stevens but only reacted to circumstances that made him fear for his life. Samad was the only defendant who retreated to a location of

16

relative safety, around the corner from where Wilson and Terrell were shooting, and then returned to shoot Stevens in the back while Stevens was on hands and knees, unarmed and crawling into the street in an attempt to escape the cross-fire. This evidence supports the finding that Samad acted with malice and not out of fear for his own safety or the safety of his friends.

By separate argument, Samad contends his conviction must be reduced to second degree murder because there is insufficient evidence of premeditation and deliberation. "A verdict of deliberate and premeditated first degree murder requires more than a showing of intent to kill. [Citation.] 'Deliberation' refers to careful weighing of considerations in forming a course of action; 'premeditation' means thought over in advance." (*People v. Koontz* (2002) 27 Cal.4th 1041, 1080 (*Koontz*).) These elements may be established by circumstantial evidence that supports an inference of premeditation and deliberation. (*People v. Anderson* (1968) 70 Cal.2d 15, 25 (*Anderson*).) *Anderson* identifies three categories of relevant circumstantial evidence: planning activity, motive evidence, and the manner or nature of the killing. (*Id.* at p. 26–27.) These factors " 'are not exclusive, nor are they invariably determinative. [Citation.] " '*Anderson* was simply intended to guide an appellate court's assessment whether the evidence supports an inference that the killing occurred as the result of preexisting reflection rather than unconsidered or rash impulse.' " ' " (*People v. Lee* (2011) 51 Cal.4th 620, 636 (*Lee*).)

In this case, Samad brought a loaded handgun to a vigil held for a friend who had just been murdered. He and his cohorts, who were also armed, surrounded Stevens, and fired guns at him from different directions. After running around the street corner, Samad made the decision to return to 92nd Avenue and fire additional shots at the back of a man who by that time

17

quite obviously posed no threat to anyone. Then he gathered his friends, collected guns from the ground and fled, leaving a man to die on the street. These facts establish a reasonable foundation for an inference that Samad acted with premeditation and deliberation. (*Anderson, supra*, 70 Cal.2d at p. 25.)

Samad argues he carried a loaded gun for general safety reasons not because he planned to commit murder. The jury was not required to believe Samad intended to use the weapon only defensively. The act of bringing a loaded firearm to a crime scene supports a reasonable inference that the defendant prepared for a violent encounter. (*People v. Salazar* (2016) 63 Cal.4th 214, 245; *Lee, supra,* 51 Cal.4th at p. 636.) Samad also argues that he had no motive to commit murder because there is no evidence Stevens even knew who T.J. was. But motive was not required, and evidence that Samad and his friends went to the vigil looking for information about T.J. could supply a possible motive for the killing, whether or not Stevens was actually involved in T.J.'s murder.

Most importantly, we disagree with Samad that the manner of the killing was not indicative of premeditation in that the entire incident occurred in 10 seconds during a "sudden gunfight," instead of Stevens being killed in an execution-style murder. " 'The process of premeditation and deliberation does not require any extended period of time. "The true test is not the duration of time as much as it is the extent of the reflection." ' " (*Koontz, supra*, 27 Cal.4th at p. 1080.) Here, the record shows that several of Samad's actions were calculated and methodical. His characterization of the incident as a "sudden gunfight" ignores the fact that all the shooters were on the same side of an altercation that they instigated. And even if the outbreak of gunfire initially caught Samad by surprise, Samad ignores the actions he

took after Stevens dropped his gun and attempted to crawl to safety. Samad's conduct in returning from around the corner to shoot a fallen Stevens in the back supports a finding that by this point the killing was the "result of preexisting thought and reflection rather than an unconsidered rash impulse." (*Lee, supra,* 51 Cal.4th at p. 637.)

## II. Cross-Examination of Wilson

Wilson's primary claim is that the judgment against him must be reversed because inadmissible evidence was disclosed to the jury. We divide this claim into two parts. First, Wilson argues that the prosecutor committed prejudicial misconduct while cross-examining Wilson about Kermit Tanner, the defendant whose case was severed prior to trial. Second, Wilson argues that after inadmissible evidence about Tanner was disclosed, the trial court erroneously denied the defendants' joint motion for a mistrial. Samad joins the second part of Wilson's argument.

### A. Additional Background

#### 1. Wilson's Testimony

While the prosecutor was cross-examining Wilson about his account of the shooting incident, Wilson confirmed his prior testimony that he yelled the word "Gun" when he saw a gun in Stevens's hand. After Wilson acknowledged that his face could be seen in the video footage of Stevens getting out of the car, the prosecutor asked whether "we should be able to see your lips moving," but the trial court sustained an objection that this question called for speculation. Then, the following exchange occurred:

> [Prosecutor]: Q. Isn't it true, Mr. Wilson, that you never yelled, "Gun"?
>
> A. I actually did. I probably didn't yell it loud, but I actually said, "Gun."

Q. Isn't it true that you already knew he had a gun?

A. I did not.

Q. Isn't it true that Kermit Tanner had already told you all, "Dude has a hammer"?

A. He never said that.

Q. Isn't that why you were afraid for Kermit Tanner to actually come and testify?

A. No.

After this colloquy, the prosecutor produced a compact disc and transcript, which were marked for identification as People's 48 and 48-A. As copies of the transcript were distributed to the jury, Wilson's counsel requested permission to approach the bench, which led to an off-the-record discussion in chambers. When the court went back on the record, it excused the jury in order to discuss defense objections to the exhibits proffered by the prosecutor.

### 2. Exhibits 48 and 48-A

Exhibit 48 contained recordings of five telephone conversations that Wilson had with people while he was in jail, and exhibit 48-A was a transcript of the phone calls. The prosecutor wanted to question Wilson about each call and play parts of them for the jury. The court considered each call separately, hearing arguments for and against admissibility.

The first call was a November 2018 conversation between Wilson and a woman named Yolanda. Wilson said that "Aoderi" wanted Yolanda to know that the reason Aoderi was "upset" with Wilson was because Wilson had nodded his head in agreement when he was asked to identify Aoderi. The prosecutor argued this call was relevant because it identified Aoderi Samad

20

as a participant in the shooting incident. Wilson and Samad objected that the call was hearsay, speculative as to Samad's state of mind, and that its probative value was outweighed by undue prejudice because Samad had already been identified by other evidence. Samad also moved for a mistrial, arguing his right to remain silent was violated because jurors had been given a transcript of this call.

The court excluded this first call, finding it was cumulative of other evidence establishing the identity of participants in the crime, and that using the call to infer something about Samad's state of mind was problematic. Regarding Samad's request for a mistrial, the court made a record of the fact that it did not make any visual observation of the jury to see whether they did or did not look at the transcript and that the chambers conference with counsel had lasted for "two minutes maybe." The court stated that it would ask the jury if they saw anything in the transcripts and then give an appropriate admonition.

The second and third calls were conversations Wilson had in October 2017, each with a male who shared his last name. During both calls, the men talked about the fact that Kermit Tanner had separated his case and expressed concern about what Tanner was doing. The prosecutor argued these calls were relevant to prove Wilson was afraid Tanner might testify against him. Wilson objected that admitting evidence of this collateral matter would be unduly time consuming. It would require Wilson to explain that he had an initial concern about what Tanner would say, but that concern was dispelled after he saw Tanner's statement to the police, which was favorable to him because Tanner told the police that there was never a plan to attack Stevens. The prosecutor responded that other parts of Tanner's statement could harm Wilson because Tanner had told the police that,

21

although he was armed, he did not shoot at Stevens. And Tanner also told police that he informed his friends that the "Dude" (Stevens) had a "hammer."

The court stated that Tanner's statement sounded relevant and opined that he could be called as a witness. At that point, Terrell objected that the prosecutor had already asked a question of Wilson that assumed Tanner's statement about the dude having a hammer was true. The question was improper, Terrell argued, because Tanner had made a deal that did not require him to testify and the defendants had been led to believe that Tanner was not going to testify. Without Tanner's testimony, the prosecutor's question was hearsay and highly prejudicial, Terrell's counsel argued. McFadden's counsel concurred, adding that his client's right to confrontation had been violated since Tanner could not be compelled to testify.

The prosecutor acknowledged she did not plan to call Tanner as a witness but argued that Wilson's fear of Tanner's testimony was relevant because Tanner was the only defendant who did not shoot his gun. The court rejected this theory, finding the probative value of the second and third phone calls was outweighed by other concerns, and instructing the prosecutor to stay away from "[t]he idea of [Tanner] testifying or not testifying." Terrell objected that the damage had already been done because the prosecutor's questions on the subject were improper. The other defendants agreed and made a joint request for a mistrial. The court stated that an admonition would cure any potential harm but agreed to interview the jurors about the matter.

The court found the final two phone calls contained admissible evidence, and evidentiary rulings regarding these two calls are not challenged on appeal.

22

### 3.  Jury Interviews

After the court ruled on the admissibility of the phone calls, it interviewed each juror about whether he or she had reviewed the prosecutor's transcript while the court and counsel had their in-chambers conference.

Four of the twelve seated jurors reported that they did not acquire or retain any substantive information from their cursory review of the transcript.  Five jurors remembered something about the first phone call between Wilson and Yolanda, but did not recall reading anything beyond that call.  Three jurors recalled that the transcript contained information about Kermit Tanner.

Juror 2 reviewed four pages of the transcript, and recalled that this portion covered two phone calls by Wilson.  In the first call, Wilson said he knew why Aoderi was mad at him and in the second call there was a reference to the fact that Tanner split from the defense.  Juror 2 stated that he or she could disregard this information if instructed to do so.

Juror 6 skimmed through the document and read about half of it.  A reference to Kermit Tanner caught this juror's attention.  Juror 6 could not remember specifics but thought the people were talking about whether or not Tanner had shared information with the authorities.

Juror 11 skimmed a couple of pages of the document and recalled it was a general conversation about how the caller was "holding up."  When questioned further, Juror 11 recalled that there was a comment about Tanner not being a part of the case and a rumor that he was separating from the trial.  Juror 11 did not draw any conclusion from this remark other than that it confirmed what he or she saw in the video, which was that people other than the four defendants were involved in the incident.

## 4. Denial of Joint Defense Motion for a Mistrial

After thorough discussion of the matter with the parties and counsel, the trial court denied the defendants' joint motion for a mistrial. The court divided the matter into two distinct issues. The first pertained to the questions that the prosecutor asked Wilson about Tanner. The court found that the prosecutor had a good faith basis for her questions and any prejudice associated with them could be cured by an admonition. The second issue pertained to distribution of the transcripts, which contained some evidence that was deemed inadmissible. The court found again that any prejudice could be cured by an admonition. Accordingly, when trial reconvened, the court gave the jury the following admonitions:

> We're ready to proceed with continued cross-examination. But before we do that, there are a couple things I need to say to you, ladies and gentlemen, with respect to last week's proceedings. I'm going to admonish you now to disregard a few things.
>
> And I think if you recall, I may have mentioned when I read some of the preliminary instructions—which was a while ago, you may not remember specifically—but there are occasions during most trials where, as the judge, I will instruct the jury to disregard certain things. So what I'm going to do now is admonish you with regard to two questions that were asked the last time we were in session, the very last session that we had.
>
> There were two questions asked when Mr. Wilson was testifying by the prosecutor. One had to do with whether or not he was asked a question or a comment was made to him to the effect that "someone had a hammer" or "dude had a hammer." And there was a second question that was asked about whether there was a concern on Mr. Wilson's part about Mr. Tanner testifying.
>
> I'm going to—I am now, I'm going to admonish you to completely disregard those questions and answers. Not consider

24

them for any purpose.  They are not evidence.  They will not be in evidence.  And they're not to enter into your deliberations or be considered for any purpose at all.  Okay?

The second thing, it has to do with the transcripts that you were handed temporarily.  When we were last in session, as you might recall, I had a little colloquy with each one of you regarding the transcripts.

The transcripts will not be coming into evidence.  To the extent that any of you may have looked at or glanced at the transcripts and read the front page, one or two of you may have looked at a page or two beyond that, that's—those are to be completely disregarded as well.  They are not going to be part of the record.  They are not going to be in evidence.  And they're not to be considered by you for any purpose whatsoever.  Okay?

So when you deliberate and the evidence that you have before you, which will be continued to be presented today, the questions that I referred to are stricken and are not to be considered for any purpose and the same is true for the transcripts.  Okay?

## B.  The Prosecutor Did Not Commit Prejudicial Misconduct

Wilson contends that the prosecutor committed misconduct by asking him the two questions about Tanner that were stricken from the record. Ordinarily, " ' "[t]o preserve a claim of prosecutorial misconduct for appeal, a defendant must make a timely and specific objection and ask the trial court to admonish the jury to disregard the improper argument." ' " (*People v. Charles* (2015) 61 Cal.4th 308, 327.)  In this case, defendants argued the prosecutors' questions were improper and so prejudicial they warranted a mistrial.  These objections were sufficient to preserve an appellate claim of prosecutor misconduct.

"A prosecutor's conduct violates the Fourteenth Amendment to the federal Constitution when it infects the trial with such unfairness as to make

the conviction a denial of due process. Conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves the use of deceptive or reprehensible methods to attempt to persuade either the trial court or the jury." (*People v. Morales* (2001) 25 Cal.4th 34, 44; accord *People v. Wilson* (2005) 36 Cal.4th 309, 337.) Wilson contends the prosecutor's questions about Tanner were misconduct under both standards. We begin by considering Wilson's state law claim.

Generally, the prosecutor has wide latitude to challenge a defendant's direct testimony during cross-examination. (*People v. Chatman* (2006) 38 Cal.4th 344, 382.) " 'When a defendant voluntarily testifies, the district attorney may fully amplify his testimony by inquiring into the facts and circumstances surrounding his assertions, or by introducing evidence through cross-examination which explains or refutes his statements or the inferences which may necessarily be drawn from them.' " (*Ibid*.)

Despite this broad scope of permissible cross-examination, a prosecutor commits misconduct under state law if she asks " 'questions of a witness that suggest facts harmful to a defendant, absent a good faith belief that such facts exist' " and can be proved. (*People v. Bolden* (2002) 29 Cal.4th 515, 562 (*Bolden*); accord, *People v. Mooc* (2001) 26 Cal.4th 1216, 1233 (*Mooc*); *People v. Visciotti* (1992) 2 Cal.4th 1, 52 ["a prosecutor may not examine a witness solely to imply or insinuate the truth of the facts about which questions are posed"].)

Wilson contends the prosecutor violated this rule because she did not have a good faith basis for asking him whether Tanner had told him that Stevens had a gun. The trial court disagreed, expressly finding a good faith basis, and rejecting the argument that there was no reason to believe Wilson

26

would answer the question affirmatively. The trial court noted Tanner's statement to the police, which had been produced to all defendants prior to trial, that Tanner told Wilson that Stevens had a gun. The fact that Wilson testified he did not know about the gun before Stevens stepped out of the car did not preclude the prosecutor from probing the matter, to see if Wilson would change his testimony if his memory was refreshed by a pointed question. As the trial court remarked, "Wilson's testimony was interesting" in that he was "in some respects, very straightforward and candid about having lied to the police and to other people about things." Wilson had also admitted other potentially harmful facts, and agreeing with the prosecutor's question here would not "have torpedoed [his] case," the trial court thought. Although the trial court might have reached a different conclusion as to whether the prosecutor had a sufficient basis to ask the question, we find substantial evidence for the factual finding of a good faith basis here, and therefore decline to disturb that finding on appeal.

Wilson contends that even if the prosecutor acted in good faith, she committed misconduct by making a "reference to facts not in evidence." This argument misconstrues a rule that precludes counsel from referring to facts not in evidence during closing argument. (*People v. Hill* (1998) 17 Cal.4th 800, 827–828.) In that context, a prosecutor who refers to facts not in evidence becomes her "own witness—offering unsworn testimony not subject to cross-examination." (*Ibid.*) Here, the prosecutor was not making an argument to the jury, but cross-examining a witness. Because the prosecutor had a good-faith basis for asking Wilson about what Tanner had said, she did not commit misconduct under state law.

Wilson contends the prosecutor committed misconduct under federal law because her questions violated Wilson's constitutional right to

27

confrontation, thereby depriving him of a fair trial.[1]  Wilson bases this argument on *Crawford v. Washington* (2004) 541 U.S. 36 (*Crawford*), which holds that, absent narrow exceptions, the "admission of 'testimonial' statements of a witness who was not subject to cross-examination at trial violates a defendant's Sixth Amendment right of confrontation, unless the witness is unavailable and the defendant had a prior opportunity for cross-examination." (*Rangel*, *supra*, 62 Cal.4th at p. 1214, citing *Crawford*, at pp. 59–60, 68.)

According to Wilson, the prosecutor violated *Crawford* because (1) Tanner's police statement was testimonial hearsay, and (2) the prosecutor referred to Tanner's statement by inquiring whether Tanner told Wilson that Stevens had a gun.  The prosecutor did not actually refer to Tanner's police statement but only asked whether Tanner told Wilson about the gun.  Nevertheless, Wilson insists his confrontation right was violated because the police statement was the source from which the prosecutor learned that Tanner told Wilson that Stevens had a gun.

Wilson's argument conflates two distinct issues.  The first question is whether Wilson's confrontation right was violated by the erroneous admission of testimonial hearsay.  It was not.  Assuming Tanner's police statement was testimonial hearsay, that statement was not admitted into evidence.  Further, the prosecutor did not ask Wilson about Tanner's police statement; she asked whether Tanner made a statement to Wilson about Stevens having a gun, and Wilson answered that Tanner did not.  These questions neither introduced nor elicited testimonial hearsay, and even if

---

[1] The People contend Wilson forfeited this claim by failing to raise it below.  The issue was preserved by McFadden who participated in the joint motion for a mistrial.

they had, the exchange was stricken from the record, thus mooting the matter altogether.

The second issue raised by Wilson's argument is whether the prosecutor committed misconduct by asking a question about a fact she knew she could not prove. Wilson claims the prosecutor knew she could not prove that Tanner told Wilson that Stevens had a gun because Tanner's police statement was inadmissible testimonial hearsay. This claim rests on the false premise that the only way to establish this fact at trial was by admitting evidence of Tanner's police statement. The trial court accepted representations by counsel that Tanner could not be compelled to testify and was not going to be called as a witness, but this did not preclude Wilson or any of the other defendants from testifying that Tanner had indeed made this statement.

Even if the prosecutor's actions could be construed as misconduct, Wilson's claim would fail for lack of prejudice, even under the heightened standard applicable to constitutional error. (*Chapman v. California* (1967) 386 U.S. 18, 24.) Wilson's theory of prejudice is that the prosecutor's disclosure that Tanner told Wilson that Stevens had a gun impaired Wilson's credibility and gave the jury reason to reject Wilson's testimony that he was taken by surprise when Stevens got out of the car with a gun in his hand. But the prosecutor did not "disclose" the statement to the jury; she simply asked Wilson whether Tanner had said these words to him, and Wilson denied that he had. Further, the brief inquiry was stricken from the record and the jury was admonished not to consider it for any purpose. The jury was also instructed with CALCRIM No. 222, that statements and questions by counsel are not evidence. Absent any indication to the contrary, "[w]e

assume the jury followed this instruction." (*Mooc, supra,* 26 Cal.4th at p. 1234.)

## C. The Motion for Mistrial Was Properly Denied

Wilson, joined by Samad, argues that the denial of the defendants' motion for a mistrial is reversible error because the prosecutor's questions about Tanner and the distribution of the transcript of the jail calls caused irreparable harm.

The trial court's denial of a mistrial is reviewed for abuse of discretion. (*People v. Ayala* (2000) 23 Cal.4th 225, 283.) A motion for mistrial "should be granted only when a party's chances of receiving a fair trial have been irreparably damaged." (*Ibid*.) "Whether a particular incident is incurably prejudicial is by its nature a speculative matter, and the trial court is vested with considerable discretion in ruling on mistrial motions." (*People v. Wallace* (2008) 44 Cal.4th 1032, 1068.) The trial court's ruling will not be disturbed unless it exercised its discretion in an " 'arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice.' " (*People v. Dunn* (2012) 205 Cal.App.4th 1086, 1094.)

Here, the record shows that the trial court acted within its discretion by denying defendants' motion for a mistrial. The court made a mid-trial ruling to exclude evidence after two questions about the matter had already been asked and answered. The court took steps to cure potential harm resulting from the jury's exposure to this excluded evidence by striking the questions and answers and admonishing the jury that the matter was not evidence, would not be evidence, and was not to enter into the jury's deliberations or be considered by them "for any purpose." The evidentiary ruling also affected evidence of Wilson's jail calls because two of the calls pertained to Tanner. Because jurors had a few minutes to review a

transcript of the calls before the exhibit was retrieved from them, the court conducted interviews and made a record of the fact that no juror was inflamed by his or her review of the transcript. Nevertheless, the court admonished the jury not to consider any information they may have gleaned from the transcript for any purpose. These circumstances support the trial court's finding that the defendants' right to a fair trial had not been irreparably harmed.

Wilson contends there was irreparable harm because the prosecutor committed prejudicial misconduct and violated Wilson's constitutional right to confrontation. We have already rejected these claims. Wilson also contends the jury took the transcript as proof that Wilson was afraid Tanner would testify that he told Wilson that Stevens had a "hammer." We disagree. Only three jurors recalled that the transcript even contained a reference to Tanner. These jurors reported that Wilson's phone conversation had something to do with the fact that Tanner had severed his case. Juror 6 was the only juror who surmised that Tanner may have shared information with the police. No juror said anything to indicate that they drew a connection between Wilson's phone calls and the prosecutor's question about whether Tanner told Wilson that Stevens had a gun.

In his appellate brief, Wilson contends that "Juror No. 6 recalled that on cross-examination, the prosecutor had 'talk[ed] about an alleged conversation between Anthony Wilson and Kermit Tanner and whether or not Kermit said something about Mr. Stevens in the car having a gun.'" But Juror 6 did not himself draw a connection between the transcript and the prosecutor's questions about Tanner; Juror 6 recalled only that Tanner's name was mentioned and "perhaps the issue or the notion that he might have shared some information." After Juror 6 shared this recollection, Wilson's

31

trial counsel asked whether Juror 6 recalled the last subject the prosecutor addressed with Wilson before the transcript was distributed "as it related to . . . Kermit Tanner." Juror 6 acknowledged recalling the prosecutor's questions but, even then, did not express the view that these questions were related to the jail calls. And it is a simple misreading of the record to assert, as Wilson does, that Juror No. 6 "recalled reading in the transcripts" about Tanner having said he saw a gun, as Juror No. 6 said no such thing and the transcripts do not mention any such statement.

Finally, Wilson contends that the trial court's admonition could not adequately repair the harm resulting from the disclosure of Tanner's statement for two related reasons. First, he contends that the prosecutor's closing argument relied on Tanner's statement that he told Wilson about Stevens's gun (even though the prosecutor did not refer to that statement) because the prosecutor encouraged the jury to find that the defendants planned to confront Stevens before they approached his car. This argument assumes erroneously that there was no other admissible evidence supportive of the prosecutor's theory that the attack on Stevens was planned. Wilson also argues that learning about Tanner's statement likely caused the jury to reject Wilson's testimony that he acted in self-defense. The crux of Wilson's defense was that he shot at Stevens *after* Stevens pointed his own gun at Terrell. This defense did not hinge on whether Wilson knew Stevens had a gun before he approached the car. It did hinge on testimony that Stevens raised his arm to shoulder level and pointed his gun at Terrell, testimony the jury could have rejected as inconsistent with the video evidence. Thus, considering the entire record reinforces our conclusion that the trial court did not abuse its discretion by finding that the questions the prosecutor asked

about Tanner and the transcript the jurors saw briefly did not cause irreparable harm.

## III.  Jury Instruction Issues

All three appellants seek reversal of the judgment due to prejudicial jury instruction errors.  "A claim of instructional error is reviewed de novo. [Citation.]  An appellate court reviews the wording of a jury instruction de novo and assesses whether the instruction accurately states the law. [Citation.]  In reviewing a claim of instructional error, the court must consider whether there is a reasonable likelihood that the trial court's instructions caused the jury to misapply the law in violation of the Constitution.  [Citations.]  The challenged instruction is viewed 'in the context of the instructions as a whole and the trial record to determine whether there is a reasonable likelihood the jury applied the instruction in an impermissible manner.' " (*People v. Mitchell* (2019) 7 Cal.5th 561, 579.)

### A.  The Concurrent Causation Instruction

Terrell contends the trial court gave an irrelevant instruction regarding concurrent causes of death, which misled the jury to believe Terrell could be convicted of murder based solely on his participation in the shooting incident. We reject this claim because the instruction correctly states the relevant law, and it is not reasonably likely the jury was misled by it.

#### 1.  Causation Principles in Homicide Cases

"The principles of causation apply to crimes as well as torts.  [Citation.] 'Just as in tort law, the defendant's act must be the legally responsible cause ("proximate cause") of the injury, death or other harm which constitutes the crime.' " (*People v. Schmies* (1996) 44 Cal.App.4th 38, 46–47, italics omitted.) "In homicide cases, a 'cause of the death of [the decedent] is an act or omission that sets in motion a chain of events that produces as a direct,

natural and probable consequence of the act or omission the death of [the decedent] and without which the death would not occur.' " (*People v. Cervantes* (2001) 26 Cal.4th 860, 866.)

CALCRIM No. 240 is the standard jury instruction addressing the concept of proximate cause. Although CALCRIM No. 240 does not discuss concurrent cause principles, California courts have long recognized that "there may be multiple proximate causes of a homicide." (*People v. Sanchez* (2001) 26 Cal.4th 834, 846 (*Sanchez*).) " ' "When the conduct of two or more persons contributes concurrently as the proximate cause of the death, the conduct of each is a proximate cause of the death if that conduct was also a substantial factor contributing to the result. A cause is concurrent if it was operative at the time of the death and acted with another cause to produce the death." ' " (*Id.* at p. 847.)

In *Sanchez, supra,* 26 Cal.4th 834, a jury convicted two defendants of first degree murder based on evidence they engaged in a gun battle that killed an innocent bystander, although it could not be determined which defendant fired the single fatal bullet. (*Id.* at p. 839.) One defendant appealed his murder conviction and the Court of Appeal reversed, finding that the fact that the victim was hit and killed by a single bullet "eliminated concurrent causation as a theory of liability for the murder." (*Ibid.*) The Supreme Court granted review and reversed the judgment of the Court of Appeal, finding that the intermediate court had erred in concluding that "principles of concurrent causation cannot be invoked in a single-fatal-bullet case." (*Id.* at p. 845.) The *Sanchez* court upheld the defendant's murder conviction because there was "sufficient evidence" that both defendants acted with malice under the doctrine of transferred intent and that "the unlawful

34

conduct of each was a substantial concurrent, and hence proximate, cause of [the victim's] death." (*Id.* at pp. 851–852.)

## 2. The Challenged Instruction

In the present case, the trial court granted the prosecutor's request for a concurrent cause instruction, stating that it would mirror language in the proximate cause instruction that was used in *Sanchez*. Defendants objected that the instruction would prevent them from disputing the prosecution theory that they orchestrated a joint attack. The court disagreed, but it granted Terrell's request to include supplemental language addressing the possibility of an intervening superseding cause of harm. Ultimately, the court used the following special instruction to instruct the jury regarding the causation issues in this case:

> An act causes death if the death is the direct, natural and probable consequence of the act and the death would not have happened without the act. A natural and probable consequence is one that a reasonable person would know is likely to happen if nothing unusual intervenes.
>
> In deciding whether a consequence is natural and probable, consider all the circumstances established by the evidence. There may be more than one cause of death. An act causes death only if it is a substantial factor in causing the death.
>
> A substantial factor is more than a trivial or remote factor: however, it does not need to be the only factor that causes the death. If you have a reasonable doubt about whether the defendant's act caused the death, you must find him not guilty.
>
> There may be more than one proximate cause of the death. When the conduct of two or more persons contributes concurrently as the proximate cause of the death, the conduct of each is a proximate cause of the death if that conduct was also a substantial factor contributing to the result.

In a homicide case in which the conduct of an intermediary is the actual cause of death, a defendant's liability will depend on whether it can be demonstrated that his own conduct proximately caused the victim's death. That is, whether it can be shown that the intermediary's conduct was merely a dependent, intervening cause of death and not an independent, superseding cause.

If proximate causation is established, the defendant's or a defendant's level of culpability for the homicide in turn will vary in accordance with his criminal intent. However, if an intermediary's conduct was an independent, superseding cause, the defendant is relieved of criminal liability. In order, though, to be independent the intervening cause must be unforeseeable, an extraordinary and abnormal occurrence which rises to the level of an exonerating, superseding cause.

On the other hand, a dependent, intervening cause will not relieve the defendant or a defendant of criminal liability. A defendant may be criminally liable for a result directly caused by his act, even if there is another contributing cause. If an intervening cause is a normal and reasonably foreseeable result of a defendant's original act, the intervening act is dependent and not a superseding cause and will not relieve the defendant of liability.

The consequence need not have been a strong possibility. A possible consequence which might reasonably have been contemplated is enough. The precise consequence need not have been foreseen. It is enough that a defendant should have foreseen the possibility of some harm of the kind which might result from the act.

The first three paragraphs of this instruction track the language of CALCRIM No. 240. The fourth paragraph tracks the *Sanchez* instruction on concurrent causation. (*Sanchez, supra*, 26 Cal.4th at pp. 843, 845.) The remaining paragraphs address the concept of superseding causation, which was discussed in concurring opinions in the *Sanchez* case.

36

### 3. Analysis

Terrell argues that the concurrent causation instruction permitted the jury to convict him of murder based solely on the fact that he participated in the shooting incident, regardless of whether he acted with criminal intent. This was error, Terrell argues, because a recent amendment to section 188, subdivision (a)(3), provides that malice "shall not be imputed to a person based solely on his or her participation in a crime."

Terrell's interpretation of the challenged instruction is not reasonable. This instruction addressed general principles of law relevant to the issue of causation, not intent. The jury received separate instructions regarding the intent elements of the charged offenses, and Terrell does not contend those separate instructions were erroneous or inadequate in any way.

Terrell argues that this instruction was complicated and confusing, and the jury was probably misled by it because the words "natural and probable consequence" were used to explain the concept of proximate cause. According to Terrell, this part of the instruction was "a back door" to the natural and probable consequences doctrine, which cannot be used to convict a defendant of murder based on an aider and abettor theory of vicarious liability. (§ 188, subd. (a)(3); see e.g. *People v. Lopez* (2019) 38 Cal.App.5th 1087, 1103, review granted Nov. 13, 2019, S258175.)

Terrell overlooks that the natural and probable consequence language in the challenged instruction is part of the legal definition of a proximate cause of death in a homicide case. That language comes from CALCRIM No. 240. It does not come from the part of the instruction addressing concurrent causes of death. Regardless, we are not persuaded that the use of this term misled the jury to believe that Terrell could be convicted of murder solely because he participated in the shooting. The instruction states that

37

"[a]n act causes death only if it is a substantial factor in causing the death," and it tells the jury that it must find the defendant not guilty if there is a "reasonable doubt about whether the defendant's act caused the death." The instruction then goes on to explain proximate causation and the possibility of concurrent causation before stating: "If proximate causation is established, the defendant's or a defendant's level of culpability for the homicide in turn will vary in accordance with his criminal intent." This language makes clear that the instruction applies to the specific issue of causation, and only to that issue. It is not at all likely that the jury misconstrued this instruction as an invitation to absolve the prosecution of the requirement of proving criminal intent by imputing a finding of malice from Terrell's mere participation in the shooting incident.

Terrell argues that the jury likely interpreted this instruction as authorizing them to "impute" malice because the jury was also instructed with CALCRIM No. 520, which permitted them to find implied malice if Terrell knowingly committed an act, "the natural and probable consequences" of which were "dangerous to human life." Terrell confuses the now-discredited theory of imputed malice with the doctrine of implied malice, which remains a valid theory by which to prove the intent element of a murder charge. To prove implied malice the prosecution must establish, not only that a defendant committed an act that was dangerous to human life, but also that the defendant knew that his own act was dangerous to human life and that he deliberately acted with conscious disregard for human life. (CALCRIM No. 520.) Terrell does not dispute that the jury received correct instruction regarding the law of implied malice.

By separate argument, Terrell intimates that concurrent causation was not a valid theory of murder liability because the facts of this case are

38

materially different from the facts of *Sanchez*. *Sanchez* holds that concurrent causation principles, which have long applied to homicide cases, can be invoked to hold more than one defendant guilty of murder *even if* the victim was killed by a single bullet. (*Sanchez, supra*, 26 Cal.4th at pp. 845 & 851–852.) In the present case, the victim was killed by multiple bullets—the cause of death listed in the autopsy report being "multiple gunshot wounds"—so to the extent this case differs from *Sanchez*, concurrent causation principles are all the more relevant here.

Finally, Terrell questions the "viability of *Sanchez*" on the ground that the Supreme Court recently granted review in *People v. Carney* (Dec. 10, 2019, No. C077558) __ Cal.App.5th __ [2019 Cal.App.Unpub. Lexis 8199] (*Carney*), review granted Mar. 25, 2020, S260063, a case in which multiple shooters were convicted of murdering a single victim. Terrell neglects to mention that the only issue under review in *Carney* is whether the concurrent causation theory can be applied to defendants who did not fire the single bullet that killed a homicide victim. This issue is not raised by the facts presented here, where Stevens was killed by multiple gunshots and the evidence does not conclusively establish which defendant fired which bullets. In any event, we are bound by *Sanchez* unless and until the California Supreme Court overrules it. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 456 (*Auto Equity Sales*).)

## B. Objections to CALCRIM Instructions

Appellants all contend that the trial court erred by using CALCRIM No. 571 to instruct the jury regarding imperfect self-defense. Pursuant to that instruction, the jury was told: "A defendant acted in imperfect self-defense or imperfect defense of another if: [¶] 1. The defendant actually believed that he or another was in imminent danger of being killed or

39

suffering great bodily injury; [¶] AND [¶] 2. The defendant actually believed that the immediate use of deadly force was necessary to defend against the danger; [¶] BUT [¶] 3. At least one of those beliefs was unreasonable."

Appellants contend this instruction was error because it did not tell the jury that a defendant acts in imperfect self-defense under a third scenario: when he reasonably believes that the immediate use of deadly force is necessary but the amount of force that he uses to defend himself or another person is "excessive." The distinction appellants draw between the concepts of deadly force and excessive force is misleading if not illusory; appellants describe no scenario in which a homicide defendant's use of deadly force could be deemed both reasonable and excessive. If the defendant's genuine belief in the immediate need to use deadly force was reasonable, the use of deadly force was not excessive. If the defendant's genuine belief in the immediate need to use deadly force was not reasonable, the use of deadly force was excessive. The standard CALCRIM instructions regarding self-defense and imperfect self-defense that were used in this case, CACRIM No. 505 and No. 571, accurately and adequately conveyed the pertinent principles. If the defendants thought this matter required special clarification, it was incumbent on them to request supplemental instruction, which they did not do. (*People v. Landry* (2016) 2 Cal.5th 52, 99–100; *Bolden, supra,* 29 Cal.4th at p. 557.)

Next, appellants challenge the use of CALCRIM No. 570 to instruct the jury regarding the concept of provocation. This instruction, which addresses the heat of passion theory of voluntary manslaughter, states in part: "The defendant killed someone because of a sudden quarrel or in the heat of passion if: [¶] 1. The defendant was provoked; [¶] 2. As a result of the provocation, the defendant acted rashly and under the influence of intense

40

emotion that obscured his reasoning or judgment; and [¶] 3. The provocation would have caused a person of average disposition to act rashly and without due deliberation, that is, from passion rather than from judgment."

Appellants contend this instruction is erroneous because it fails to tell the jury that the victim need not have actually engaged in provocative action, so long as the defendant reasonably attributed the provocative conduct to the victim. (Citing *People v. Lee* (1999) 20 Cal.4th 47, 59 ["The provocation which incites the defendant to homicidal conduct in the heat of passion must be caused by the victim [citation], or be conduct reasonably believed by the defendant to have been engaged in by the victim"].)

We reject this claim of error because when CALCRIM No. 570 is read as a whole, it authorizes the jury to find provocation if the defendant reasonably believed the victim engaged in provocative conduct. The instruction does not contain any language stating or suggesting that the defendant must have been provoked *by the victim's conduct,* as the requirement for provocation is set forth in the passive voice: "The defendant was provoked." (CALCRIM No. 570.) Further, appellants overlook a subsequent portion of the instruction that focuses the jury on the question whether conduct that the defendant characterizes as provocation would have provoked a reasonable person in the defendant's situation. The instruction states: "In deciding whether the provocation was sufficient, consider whether a person of average disposition, in the same situation and knowing the same facts, would have reacted from passion rather than from judgment." (*Ibid.*) Here, too, the focus is on the defendant's perception, and not on the source of the provocation.

In another challenge, Samad and Wilson contend the trial court erred by instructing the jury with CALCRIM No. 3472, which states: "A person

41

does not have the right to self-defense if he or she provokes a fight or quarrel with the intent to create an excuse to use force." Appellants do not argue that the instruction is inaccurate but contend instead that it is not supported by the trial evidence.

First, both Samad and Wilson forfeited this claim by failing to object to the instruction in the trial court. (*People v. Frandsen* (2011) 196 Cal.App.4th 266, 278.) Second, the allegation that an instruction correct in law was not supported by substantial evidence is insufficient to establish reversible error because "the jury is presumed to disregard an instruction if the jury finds the evidence does not support its application." (*Ibid*.) Third, this claim fails on its merits. "A party is entitled to a requested instruction if it is supported by substantial evidence. [Citation.] Evidence is '[s]ubstantial' for this purpose if it is 'sufficient to "deserve consideration by the jury," that is, evidence that a reasonable jury could find persuasive.' " (*People v. Ross* (2007) 155 Cal.App.4th 1033, 1049–1050.) Here, the jury could reasonably have concluded that appellants provoked an altercation with Stevens by surrounding him and forcing him to get out of his car, and that at least one of them took this provocative action with the intent to create an excuse to shoot him. Wilson and Terrell denied any such intention, but evidence of their actions on the day in question was sufficiently ambiguous to support instruction on the matter.

## C. Failure to Give a Mistake of Fact Instruction

Terrell contends the judgment against him must be reversed because the jury was not instructed that mistake of fact was a defense to the charge that he murdered Stevens.

## 1. Additional Background and Terrell's Contentions

Mistake of fact is a common law and statutory defense to a criminal charge. (*People v. Lucero* (1988) 203 Cal.App.3d 1011, 1016; § 26.) "Penal Code section 26 lists classes of persons deemed incapable of committing crimes, including '[p]ersons who committed the act . . . charged under an ignorance or mistake of fact, which disproves any criminal intent.' " (*People v. Givan* (2015) 233 Cal.App.4th 335, 343.) "A 'mistake of fact' defense negates an element of a charged crime because it disproves criminal intent. [Citations.] However, a mistake of fact jury instruction is not appropriate where the defendant's mistaken belief does not negate an element of the crime." (*Id*. at p. 345; see CALCRIM No. 3406.) Put another way, the mistake of fact defense "applies only in limited circumstances, specifically when the defendant holds a mistaken belief in a fact or set of circumstances which, if existent or true, would render the defendant's otherwise criminal conduct lawful." (*People v. Lawson* (2013) 215 Cal.App.4th 108, 111 (*Lawson*).)

Here, Terrell's defense was that he acted in self-defense. In closing argument, Terrell's counsel argued the evidence showed that Stevens overreacted when Terrell opened the car door and provoked a violent altercation with Terrell. Counsel argued that Stevens was the aggressor in the dispute because he spoke to Terrell in an angry and hostile manner, brandished his gun with its long clip, and began to raise his gun as he took an aggressive step toward Terrell. These facts alone were sufficient to justify Terrell's actions, counsel argued. But there was more, because then Terrell heard a gunshot and had a "human reaction." Assuming the shot was fired by Stevens, Terrell flinched and then protected himself from imminent

43

danger by firing his gun until the threat was gone. In light of this evidence, counsel argued that Terrell was not guilty of any crime.

On appeal, Terrell contends that the most likely reason his self-defense claim failed was because the jury was not instructed on mistake of fact. Terrell concedes he did not request a mistake of fact jury instruction, but argues the instruction was required because it was a crucial component of his defense and it was supported by substantial evidence. In presenting this claim, Terrell offers two theories of error: (1) the trial court violated a sua sponte duty to instruct on mistake of fact, and (2) Terrell was denied the effective assistance of counsel because his trial counsel failed to request a mistake of fact instruction.

### 2. The Trial Court's Duty

The trial court did not have a duty to instruct sua sponte on mistake of fact, even if there was substantial evidence to support this defense. (*Lawson, supra,* 215 Cal.App.4th at p. 117, applying *People v. Anderson* (2011) 51 Cal.4th 989, 992.) *Anderson* was a robbery case, in which the defendant argued his use of force—running over the owner of a car he was stealing— was an accident. (*Id.* at p. 993.) The case held that trial courts do not have a sua sponte duty to instruct on the defense of accident, provided that the jury is properly instructed on the mental state element of the charged crime. (*Id.* at pp. 997–998.) The court reasoned that because an accident defense serves only to negate the intent element of the offense charged, the trial court's instructional duty is limited to providing an appropriate pinpoint instruction upon request. (*Ibid.*) *Anderson's* rationale "applies with equal force to the defense of mistake of fact, or any other defense that operates only to negate the mental state element of the crime." (*Lawson,* at p. 117; see *People v. Hussain* (2014) 231 Cal.App.4th 261, 268–269.)

44

Terrell asks this court not to follow *Anderson*, arguing that *Anderson* relied on an erroneous "definition of pinpoint instructions" and drew "artificial distinctions between 'real' defenses and defenses that 'merely' negate criminal intent." We read *Anderson* as resting on the principle that a "trial court's sua sponte instructional duties do not extend to defenses that serve only to negate an element of the crime." (*People v. Covarrubias* (2016) 1 Cal.5th 838, 874 & fn. 14.) In *Covarrubias*, the Supreme Court affirmed this principle and expressly approved cases holding that there is no sua sponte duty to instruct on mistake of fact. (*Ibid*.) We decline Terrell's invitation to part with this binding precedent. (*Auto Equity Sales, supra,* 57 Cal.2d 450.)

### 3. Effective Assistance of Counsel

To overcome a presumption that he received constitutionally adequate representation, Terrell would have to prove that (1) his trial counsel's representation was deficient in that it fell below an objective standard of reasonableness under prevailing professional norms, and (2) he suffered prejudice flowing from counsel's deficient performance such that the outcome of the proceeding would have been different if not for his counsel's error. (*People v. Lucas* (1995) 12 Cal.4th 415, 436.)

Terrell contends his trial counsel performed deficiently because the omission of a mistake of fact instruction *precluded* the jury from finding that Terrell acted in self-defense. We disagree. If the jury found that Terrell believed Stevens fired the first shot, the instructions provided two avenues for returning a verdict other than murder. First, if Terrell's belief in the need to defend himself was reasonable, the jury could have found him not guilty pursuant to CALCRIM No. 505, the self-defense jury instruction, which told the jury that Terrell was not guilty if he "reasonably believed that he or

45

another was in imminent danger of being killed or suffering great bodily injury." Second, if the jury found that Terrell's belief in the need to defend himself was genuine but not reasonable, he could have been convicted of voluntary manslaughter pursuant to CALCRIM No. 571, the imperfect self-defense instruction.

Terrell argues that a mistake of fact instruction was crucial to his defense because without it the jury was never told to consider the facts from Terrell's perspective. CALCRIM No. 505 states: "When deciding whether the defendant's beliefs were reasonable, consider all the circumstances as they were known to and appeared to the defendant and consider what a reasonable person in a similar situation with similar knowledge would have believed. If the defendant[']s beliefs were reasonable, the danger does not need to have actually existed." Thus, the jury was instructed to consider the circumstances from the perspective of the defendant.

If the jury had accepted Terrell's argument for imperfect self-defense—that he reasonably but mistakenly thought Stevens had shot at him at close range—we can see how a pinpoint mistake of fact instruction could have been beneficial to Terrell. It would have highlighted the fact that Terrell's alleged mistake about who fired the first shot could not only establish a basis for imperfect self-defense, but could also justify a complete defense verdict. However, focusing the jury on the question of who fired what shot could have been dangerous. There is no evidence that Stevens ever fired his gun; he was neither the first person to shoot, nor did he react to gunfire by shooting his weapon at anyone that day. Furthermore, the video evidence suggests that Stevens did not even raise his gun, let alone aim it at Terrell. Thus, requesting a pinpoint mistake of fact instruction risked focusing the jury's attention on evidence that was damaging to Terrell's defense. Under these

46

circumstances, there may have been a tactical reason not to request the instruction, which precludes Terrell from proving ineffective assistance of counsel. (*People v. Centeno* (2014) 60 Cal.4th 659, 675.)

Finally, Terrell's theory of prejudice is unavailing. He argues that his self-defense claim was compelling precisely because of his mistaken belief that Stevens had fired at him, and yet "this was the one fact the jury could *not* consider as it weighed whether to acquit him." First, defense counsel argued explicitly that Stevens was the aggressor even before a shot was fired. Counsel told the jury that when Stevens got out of the car, he was "hostile and upset," got "close and confrontational" with Terrell, and had a firearm with an extended clip in his hand, which he was "displaying," "moving," and "lifting" in Terrell's direction when he was only "one step away from him." Thus, although Terrell also relied on evidence that he mistakenly believed Stevens shot at him, that was not the sole basis for his defense.

Further, the instructions on self-defense and imperfect self-defense *did* permit the jury to consider whether Terrell mistakenly believed that Stevens fired the first shot. If the jury concluded Terrell actually, but unreasonably, believed Stevens was firing at him they could have convicted Terrell of voluntary manslaughter rather than second degree murder. Because the jury rejected voluntary manslaughter for Terrell, it is not reasonably likely that a mistake of fact instruction would have affected the outcome of these proceedings.

## IV. Sentencing Issues

### A. The Firearm Use Enhancement

Terrell contends the trial court erroneously denied his motion to strike the 25-year-to-life sentence enhancement imposed on him for personally and

intentionally discharging a firearm and proximately causing death. (§ 12022.53, subd. (d).)

The trial court had discretion to strike this firearm use enhancement in the interest of justice pursuant to section 1385. (§ 12022.53, subd. (h).) Contending the court abused its discretion, Terrell claims erroneously that the court failed to "explicitly" consider his request to strike the enhancement. At the sentence hearing, the court stated: "To the extent that [Terrell] specifically made a request that I exercise my discretion with respect to the use enhancement pursuant to section 12022.53[, subdivision ](h), I'm not inclined to exercise my discretion in that regard with respect to Mr. Terrell given the nature of the offense and prior convictions. So I will deny that."

We also reject Terrell's contention that the trial court abused its discretion by denying Terrell an "individualized sentencing determination." Before the court announced Terrell's sentence, it stated that it read his probation report, a letter from the District Attorney about him, and all material submitted by Terrell's trial counsel, including letters, photos, and restitution information. Because Terrell was not eligible for probation, the court did not address criteria affecting probation, but it delineated the relevant aggravating circumstances. Factors in aggravation that pertained "specifically" to Terrell included that he had "engaged in violent conduct, indicating a danger to society," he had "numerous prior convictions of increasing seriousness, and his performance, prior performance on juvenile and adult probation was not satisfactory." Then, after imposing Terrell's sentence, the court denied Terrell's motion to strike the firearm enhancement, expressly declining to exercise its discretion to strike the enhancement because of the nature of Terrell's offense and his prior convictions.

Terrell argues the trial court abused its discretion because it failed to consider whether a lesser enhancement under section 12022.53 was more suitable to Terrell's crime. Terrell bases this argument on *People v. Morrison* (2019) 34 Cal.App.5th 217, 223. *Morrison* held that when a trial court is considering whether to impose an enhancement under section 12022.53, subdivision (d), it has discretion to impose an uncharged lesser firearm enhancement under section 12022.53, subdivision (b) or (c). (*Morrison*, at pp. 222–223; but see *People v. Tirado* (2019) 38 Cal.App.5th 637, 642–645, review granted Nov. 13, 2019, S257658.) Because the record did not reflect that the trial court understood that it could impose a lesser enhancement, the *Morrison* court remanded the case for resentencing.

*Morrison* does not apply here. Terrell was charged with lesser enhancements under section 12022.53, which the jury found to be true. Furthermore, the record shows that the trial court understood it had the discretion to impose a lesser enhancement. It elected not to do so by denying Terrell's motion to strike the subdivision (d) enhancement and imposing stayed sentences for the lesser enhancements.

## B. Restitution Fines and Court Fees

Terrell contends the trial court erred by imposing a $10,000 restitution fine pursuant to section 1202.4. He argues that imposing this fine without considering his ability to pay constituted a due process violation under the reasoning of *People v. Dueñas* (2019) 30 Cal.App.5th 1157 (*Dueñas*). Samad makes the identical claim, incorporating by reference Terrell's argument.

The restitution fine was imposed under section 1202.4, subdivision (b), which states: "In every case where a person is convicted of a crime, the court shall impose a separate and additional restitution fine, unless it finds compelling and extraordinary reasons for not doing so and states those

49

reasons on the record." When the person has been convicted of a felony, the fine must be set at an amount between $300 and $10,000 that is "commensurate with the seriousness of the offense." (*Ibid*.) The "defendant's inability to pay shall not be considered a compelling and extraordinary reason not to impose a restitution fine," but the court should consider inability to pay before setting a fine above the statutory minimum. (§ 1202.4, subd. (c).) The defendant bears the burden of overcoming a presumption that he has the ability to pay a restitution fine imposed under this statute. (§ 1202.4, subd. (d); *People v. DeFrance* (2008) 167 Cal.App.4th 486, 505 (*DeFrance*).)

In the present case, when the court ordered Samad to pay a $10,000 restitution fine, he did not object on any ground, thereby forfeiting his claim that the fine was imposed in error. (*People v. Aguilar* (2015) 60 Cal.4th 862, 864; *People v. Trujillo* (2015) 60 Cal.4th 850, 856; *People v. McCullough* (2013) 56 Cal.4th 589, 596–597; *People v. Nelson* (2011) 51 Cal.4th 198, 227; *People v. Avila* (2009) 46 Cal.4th 680, 729.) Thus, we limit our discussion to Terrell.

At the sentencing hearing, Terrell's trial counsel objected to the imposition of any fines or fees, stating: "[M]y client is indigent, doesn't have any money, cannot afford any type of fine. And I would object to the imposition of any type of fine as a violation of due process." The trial court acknowledged the objection before it imposed Terrell's sentence, stating that it had considered the probation report, letters submitted by Terrell, and "the restitution information." Then, the court announced Terrell's sentence, which included a $10,000 restitution fine. When it imposed this fine, the court made a "record" of its response to defense counsel's objection, stating:

"[T]here are cases that indicate that in a case of this nature with a sentence of this nature, that earnings from prison wages can be applied to such a fine."

On appeal, Terrell contends the trial court erred by imposing the $10,000 fine without finding that Terrell had the present ability to pay it. We disagree that such a finding is required. The record summarized above affirmatively shows that the trial court did consider Terrell's ability to pay as required by the statute and then concluded the statutory maximum fine was proper due to the seriousness of the crime and the availability of prison wages.

Terrell contends his restitution fine is unconstitutional under "the due process analysis in *Dueñas*." The *Dueñas* defendant was convicted of a misdemeanor for driving on a suspended license and sentenced to probation. (*Dueñas, supra*, 30 Cal.App.5th at p. 1160.) At her sentencing hearing she objected that she did not have the ability to pay statutory fees and fines, requested a hearing on the matter and produced undisputed evidence establishing her inability to pay. (*Id.* at p. 1162.) Consequently, the court struck some fees, but imposed others that it concluded were mandatory. (*Id.* at pp. 1162–1163.) Under that unique cluster of circumstances, the appellate court found that imposition of the statutory fines and fees violated due process. (*Id.* at p. 1168–1172.) Regarding the restitution fine specifically, the *Dueñas* court found that the fine triggered constitutional concerns because the statute required imposition of a minimum fine irrespective of the defendant's ability to pay it. (*Id.* at p. 1172.)

First, we note that multiple courts have criticized the due process analysis employed in *Dueñas*. (See *People v. Cowan* (2020) 47 Cal.App.5th 32, 42, review granted June 17, 2020, S261952 (*Cowan*); *People v. Kopp* (2019) 38 Cal.App.5th 47, review granted Nov. 13, 2019, S257844.) But even

51

if *Dueñas* is legally sound, it does not apply to the facts presented here, where Terrell was not required to pay a mandatory restitution fine as a condition of securing probation. As this court has previously explained, the *Dueñas* defendant presented compelling evidence that she was an indigent probationer whose inability to pay court assessments resulted in ongoing, unintended punitive consequences. (*People v. Johnson* (2019) 35 Cal.App.5th 134, 138–139.) These consequences of nonpayment implicated due process principles because they constituted additional punishment due *solely to the fact* that the defendant was indigent. (*Dueñas, supra*, 30 Cal.App.5th at p. 1168.) Terrell's factual situation is markedly different: Terrell was convicted of murder; received a lengthy prison sentence; did not produce any evidence regarding his financial circumstances at his sentencing hearing; and was ordered to pay a statutory maximum restitution fine. Terrell does not articulate how imposition of this fine will have an unforeseen punitive consequence.

Moreover, since *Dueñas* was decided, this Division has expressed the view that constitutional challenges to fines and fees based on an inability to pay should be evaluated under the Eighth Amendment and article I, section 17 of the California Constitution. (*Cowan*, *supra,* 47 Cal.App.5th at p. 42.) Under the Eighth Amendment, four factors are relevant to a constitutional excessive fines analysis: " '(1) the defendant's culpability; (2) the relationship between the harm and the penalty; (3) the penalties imposed in similar statutes; and (4) the defendant's ability to pay.' " (*Id*. at p. 47.) In the present case, Terrell purports to rely on the Eighth Amendment in his Appellant's Opening Brief, but he does not present any argument as to how a proper consideration of all four relevant factors would compel a finding that the $10,000 restitution fine is excessive. Thus, Terrell falls short of

52

establishing that the fine is unconstitutional. (See *People v. Miralrio* (2008) 167 Cal.App.4th 448, 452, fn. 4 [appellate court need not address undeveloped claims or ones inadequately briefed]; *In re S.C.* (2006) 138 Cal.App.4th 396, 408 [judgment is presumed correct on appeal; to demonstrate error, appellant must present meaningful legal analysis supported by citations to authority]; see also *U.S. v. Cheeseman* (3rd Cir. 2010) 600 F.3d 270, 283 [defendant bears the burden of establishing a fine is unconstitutionally excessive]; *U.S. v. Viloski* (2nd Cir. 2016) 814 F.3d 104, 109 [same].)

In his Reply Brief, Terrell disputes the "assumption" that he will be able to pay his restitution fine from prison wages. Although *Dueñas* speaks of present ability to pay, we follow authority holding that the evaluation of ability to pay must include future ability to pay. (*Cowan, supra*, 47 Cal.App.5th at p. 49.) When considering a defendant's ability to pay a restitution fine, the court is not limited to consideration of a discrete time period and is not precluded from considering prison wages. (*People v. Douglas* (1995) 39 Cal.App.4th 1385, 1396–1397; *People v. Hennessey* (1995) 37 Cal.App.4th 1830, 1837; *People v. Gentry* (1994) 28 Cal.App.4th 1374, 1376–1378; *People v. Frye* (1994) 21 Cal.App.4th 1483, 1487.)

Finally, Terrell contends that his trial counsel's "assertions about his finances" were sufficient to establish that Terrell lacks the ability to pay a $10,000 restitution fine. We disagree; counsel preserved the objection, but his argument was not evidence. Terrell had the burden of proof on this issue. (§ 1202.4, subd. (d); *DeFrance, supra,* 167 Cal.App.4th at p. 505.) Indeed, this would be true even if the trial court had imposed a statutory minimum fine. (*Cowan, supra*, 47 Cal.App.5th at p. 49.) In any event, as we have explained,

inability to pay is only one of several relevant factors when evaluating a claim that a fine is constitutionally excessive.

## DISPOSITION

The judgments and sentences are affirmed.

TUCHER, J.

WE CONCUR:

STREETER, Acting P. J.
BROWN, J.

*People v. Wilson/Samad/Terrell* (A157926/A157930/A157931)

54